WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Philip Mindlin
Emil A. Kleinhaus
Neil K. Chatani

Attorneys for David Jiménez Márquez
as Petitioner and Foreign Representative

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| Codere Finance (UK) Limited, | Case No. 15-13017 |
| Debtor in a Foreign Proceeding. | |

**VERIFIED PETITION FOR RECOGNITION**
**OF FOREIGN MAIN PROCEEDING**

David Jiménez Márquez (the "Petitioner"), duly appointed by an October 16, 2015

resolution (the "Resolution of Appointment") of the board of directors of Codere Finance (UK)

Limited  ("Codere UK" or the "Debtor"), an English private limited company incorporated under

the laws of England and Wales, and as authorized by an October 29, 2015 order (the "Convening

Court Order") of the Chancery Division (Companies Court) of the High Court of Justice of

England and Wales (the "UK Court") to act as the foreign representative (in such capacity, the

"Foreign Representative") with respect to a voluntary restructuring proceeding concerning the

Debtor (as further described herein and in the Scheme, the "Restructuring") through a scheme of

arrangement (the "Scheme") before the UK Court (the "UK Proceeding"), respectfully submits

this verified petition in furtherance of the Form of Voluntary Petition filed concurrently

herewith, ECF No. 1 (together, the "Petition"), for entry of an order (i) recognizing the UK

Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"),[1] (ii) granting relief

pursuant to section 1520, and (iii) granting further relief pursuant to sections 105(a), 1507(a),

1509(b)(2)-(3), 1521(a) and 1525(a).  In support of this Petition, the Petitioner has filed herewith

and incorporates by reference the Declaration of David Jiménez Márquez as Foreign

Representative (the "Foreign Representative Declaration"),[2] ECF No. 3, and the Declaration of

Iain White, a London-based partner in the restructuring and insolvency department of Clifford

Chance LLP (the "UK Declaration"), ECF No. 4, in each case, pursuant to 28 U.S.C. § 1746.

## BACKGROUND

A.    **Overview**

1.    Rainbowdove Limited was incorporated under the laws of England and Wales as

a private limited company on September 2, 2014.  The company's name was changed to Codere

UK (Finance) Limited on October 29, 2014.  Its company number is 9200465.  The certificate of

incorporation and the certificate of incorporation on change of name are attached to the Foreign

Representative Declaration as Exhibit C.

2.    Codere UK is a direct, wholly owned subsidiary of Codere S.A. ("Holdco,"

together with its direct and indirect subsidiaries, "Codere" or the "Group"), which is

incorporated under the laws of Spain.  Approximately 51.35% of the shares of Holdco are owned

by Masampe Holding B.V. ("Masampe"), a Dutch private limited company, 30.87% are owned

by the public, and the remaining 17.78% are held by members of the Martinez Sampedro family.

---

[1]  Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.
[2]  True and correct copies of each of the Resolution of Appointment and the Convening Court
Order are attached to the Foreign Representative Declaration as Exhibits A and B.

Masampe is wholly owned by members of the Martinez Sampedro family.  Foreign Rep. Decl.
¶ 5.

3.      The overwhelming majority (by number and amount owed) of Codere UK's
creditors are the holders (the "Noteholders") of its $300,000,000 in 9.25% Notes due 2019
("USD Notes") and its €760,000,000 in 8.25% Notes due 2015 ("Euro Notes" and, together with
the USD Notes, the "Notes").  The Notes were initially issued by Codere Finance (Luxembourg)
S.A. ("Codere Finance"), another wholly-owned subsidiary of Holdco.  Pursuant to supplemental
indentures dated as of February 18, 2015, the Debtor became a co-issuer of the Notes and
assumed a primary obligation in respect thereof, jointly and severally with Codere Finance.  The
Notes are guaranteed by various members of the Group.  More information about the Notes is
provided in paragraphs 10 to 13 below.  Codere UK has no other financial debt.  Codere UK's
other liabilities are to service providers for work in relation to the administration of the
Restructuring and the Scheme.  Foreign Rep. Decl. ¶ 6.

4.      The Restructuring to be facilitated by the Scheme is proposed to (i) provide a
comprehensive solution to the financial problems faced by the Group and (ii) maximize recovery
for the Noteholders.  At this time, approximately 95.1% of the Noteholders have agreed to
support the Restructuring.  Foreign Rep. Decl. ¶ 45.  The steps proposed to effectuate the
Restructuring are outlined in paragraphs 45 to 50 below.

5.      David Jiménez Marquez, the Petitioner and Foreign Representative, has been a
director of Codere UK, the Debtor, since its acquisition by Holdco.  He has also served as
Director in the Office of the Chairman and General Counsel of Codere since 2011.  Previously,
he was Managing Director at Deutsche Pfandbriefbank AG from 2008 to 2011.  Between 2005
and 2008, he was a Senior Lawyer at Linklaters, specializing in real estate and finance.  Before

that, Mr. Jiménez worked at the law firm Clifford Chance, specializing in corporate and real estate matters.  Foreign Rep. Decl. ¶ 2.

**B.    <u>The Business of the Debtor and the Group</u>**

6.    The business of the Group is focused on multi-national gaming activities.  The Group manages gaming machines, machine halls, bingo halls, horse racing tracks, casinos and sports betting locations throughout Latin America, Italy and Spain, with current operations principally focused on the Mexican, Argentine, Italian and Spanish gaming markets.  As of June 30, 2015, the Group managed 51,957 gaming machines, 180 gaming halls (including machine halls, bingo halls with machines, and machine halls at racetracks and casinos), 1,769 sport betting locations and two horse racing tracks.  The Group's business focuses on low-cost, high-volume gaming.  Foreign Rep. Decl. ¶ 7.

7.    The gaming industry has traditionally been controlled by governments.  There are still countries where participation by private groups is not permitted and where the government monopolizes the management of the industry.  In countries where participation by private groups is permitted, the gaming industry is nevertheless highly regulated.  As a result of the high level of state regulation in the gaming industry, the Group can only focus on a limited number of factors within its control to improve results of operations.   Foreign Rep. Decl. ¶ 8.

8.    Since 2011, the Group has expanded its business into the online gaming industry, which includes gaming via the Internet, telephone, and television.  The online gaming industry is heavily regulated in most countries and the Group is required to set up systems, controls and procedures to ensure compliance with applicable rules and regulations.  In addition, the online gaming rules and regulations of certain countries, such as the United States (where the Group does not operate), require the Group to block their residents from its online gaming sites. Foreign Rep. Decl. ¶ 9.

9.      Regulatory and currency risks are the Group's principal business risks.  In certain markets where the Group operates, regulation and taxation of the gaming industry are not well developed or are inconsistent, creating uncertainty for the Group.  The Group is also exposed to foreign exchange rate risk because its reporting currency is the Euro, whereas the majority of the Group's subsidiaries keep their accounts in other currencies, principally the Argentine Peso, Mexican Peso, Panamanian Balboa (equivalent to the US Dollar), Colombian Peso, Uruguayan Peso and Brazilian Real.  For the 12 months ended June 30, 2015, 38.5% and 23.6% of operating revenue was denominated in the Argentine Peso and Mexican Peso, respectively, and 72.5% of operating revenue was in non-Euro denominated currencies.   Foreign Rep. Decl. ¶ 10.

**C.      Summary of the Group's Capital Structure**

10.     As discussed above, the USD Notes were initially issued by Codere Finance, a direct wholly-owned subsidiary of Holdco, pursuant to an indenture dated February 8, 2012 (as amended and/or supplemented, the "USD Indenture"), between, among others, Codere Finance and Deutsche Bank Trust Company Americas as trustee (the "Original USD Trustee").  The Euro Notes were initially issued by Codere Finance pursuant to an indenture dated June 24, 2005 (as amended and/or supplemented from time to time, the "Euro Indenture," and together with the USD Indenture, the "Indentures"), between, among others, Codere Finance and Deutsche Trustee Company Limited as trustee (the "Original Euro Trustee," and together with the Original USD Trustee, the "Original Trustees").  Foreign Rep. Decl. ¶ 11.  On February 18, 2015, GLAS Trust Corporation Limited replaced the Original Trustees as trustee under each of the Indentures (hereinafter referred to as the "Trustee").  Foreign Rep. Decl. ¶ 12.

11.     Pursuant to supplemental indentures dated February 18, 2015, Codere UK became a party to the Indentures and assumed a primary, joint and several obligation as a co-issuer of the Notes.  Foreign Rep. Decl. ¶ 13.

5

12.     The Notes are guaranteed by Holdco and various of its subsidiaries (collectively,
the "Guarantors").  The Notes and the guarantees of the Notes are further secured by pledges of
shares in various members of the Group and certain intra-Group balances.  Foreign Rep. Decl.
¶ 14.

13.     The Indentures are governed by New York law.  Copies of the Indentures, as well
as the supplemental indentures pursuant to which the Debtor became a co-issuer of the Notes, are
attached to the Foreign Representative Declaration as Exhibit E.

**D.     The Group's Financial Situation and Restructuring Negotiations**

**i.     The Group's Recent Performance**

14.     For the 12 months ending June 30, 2015, the Group generated operating revenue
of €1,534.6 million and EBITDA of €280.5 million.  Argentina, Mexico, Italy, and Spain
accounted for €259.3 million, or approximately 92%, of the Group's EBITDA for the 12-month
period ending June 30, 2015.  Foreign Rep. Decl. ¶ 15.

15.     The last few years have been difficult for the Group.  In the 12 months ending
June 30, 2015, the Group derived 44% of its consolidated adjusted EBITDA (before corporate
overhead) from operations in Argentina.  However, the operating environment in Argentina has
been, and remains, challenging and unpredictable, due principally to the unstable
macroeconomic conditions.  Moreover, although Argentina is the Group's largest EBITDA
contributor, Holdco's access to cash flows from Argentina has historically been restricted and
future access remains uncertain in light of actions on the part of the Argentine authorities to
tighten foreign-exchange controls.  Foreign Rep. Decl. ¶ 16.

16.     Other factors that have affected the Group's performance include the effects of
the economic recession in Europe and the introduction of anti-smoking regulations in places
where the Group has operations.  These events coincided with the substantial investment, and

incurrence of debt, by the Group to consolidate ownership of its Mexican subsidiaries,

undertaken in anticipation of selling a significant stake in the Latin American business.  Foreign

Rep. Decl. ¶ 17.

17.     In February 2014, the Group announced its 2013 results, which were weaker than

expected.  The Group generated operating revenue of €1.5 billion and EBITDA of €206 million,

compared to €287 million in the same period in 2012, an EBITDA decrease of 28%.  EBITDA

decreased principally as a result of the devaluation of the Argentine Peso and the introduction of

anti-smoking regulations in Argentina, tax increases in Italy and, to a lesser extent, hall closures

in Monterrey, Mexico .  Foreign Rep. Decl. ¶ 18.

18.     As a result of those events, projected short-term liquidity, and impending debt

maturities, the board of directors of Holdco filed for protection under Article 5 bis of the Spanish

Insolvency Law (*pre concurso*) on January 2, 2014.  Some of the Spanish sub-holding companies

within the Group also filed for such protection in early February 2014. This afforded those

companies the time to continue to negotiate the Restructuring without needing to file for Spanish

*concurso* bankruptcy immediately.  The protection period ended in May and June 2014, and the

Group has been operating under continuing forbearance and standstill agreements, including the

Lock-Up Agreement (described below).  Foreign Rep. Decl. ¶ 19.

### ii.    Appointment of Advisors and Negotiation of Terms

19.     In March 2013, the Group began to work with both legal and financial

restructuring advisors to develop plans and contingencies to seek to address its financial

difficulties.  Foreign Rep. Decl. ¶ 20.

20.     In May 2013, the Group and its advisors commenced negotiations with respect to

the terms of a restructuring with an informal ad hoc committee of Noteholders (the

"Ad Hoc Committee").  The intention of those negotiations was to reach an agreement on how to

reduce the financial pressure on the Group and ensure it could continue to operate as a going concern.  Foreign Rep. Decl. ¶ 21.

21.     Since that time, the Group and its advisors, on the one hand, and the Ad Hoc Committee and its advisors, on the other hand, have been engaged in a constant dialogue, with the aim of addressing the unsustainable debt burden of the Group.  Foreign Rep. Decl. ¶ 21.

22.     In those discussions, a number of alternatives were considered relating to the Group's debt burden.  The Group and the Ad Hoc Committee concluded that, for various reasons, a restructuring proceeding in Spain would be inadequate to produce a comprehensive resolution and that a UK scheme should be undertaken.  The Group and the Ad Hoc Committee further determined that Holdco should create a UK subsidiary – Codere UK – to facilitate the UK scheme process.  Foreign Rep. Decl. ¶ 22.

23.     On September 23, 2014, Holdco announced that key terms of a restructuring had been agreed with the Ad Hoc Committee and certain other Noteholders, as well as with Masampe.  Foreign Rep. Decl. ¶ 23.

### iii.   Terms of the Restructuring

24.     On September 23, 2014, holders representing a substantial majority (by amount) of the Euro Notes and of the USD Notes entered into a Lock-up Agreement to implement the restructuring.  The Lock-up Agreement was amended and restated on August 18, 2015.  Holders of over 95.1% in aggregate principal amount of the Notes are currently party to the Lock-Up Agreement.  Pursuant to the terms of the Lock-up Agreement, the consenting Noteholders have agreed, among other things:

- to take all reasonable actions to support, facilitate and implement the Restructuring in a manner consistent with the terms of the Lock-up Agreement; and

- to take all steps consistent with and reasonably required to implement the Restructuring (including taking all steps necessary to vote in favor of the Scheme).

Foreign Rep. Decl. ¶ 24.

25.     The obligations of the parties to the Lock-up Agreement will terminate on

December 31, 2015 (subject to extension (i) to March 31, 2016, by approval of Holdco, 75% of

consenting Noteholders and each party providing a backstop commitment, or (ii) to a later date

by approval of Holdco, each consenting Noteholder and each party providing a backstop

commitment).  Foreign Rep. Decl. ¶ 25.

26.     The key features of the consensual Restructuring include:

- the transfer to Noteholders of the USD equivalent of €150 million in newly-issued 5.5% cash pay and 3.5% PIK coupon second-lien senior secured notes (the "New Second Lien Notes") to be issued by Codere Finance 2 (Luxembourg) S.A. ("New Codere Finance"), a wholly owned subsidiary of Holdco;

- the transfer to Noteholders of the USD equivalent of €325 million in newly-issued 9% PIK third-lien senior secured notes to be issued by New Codere Finance (the "New Third Lien Notes");

- the issue to Noteholders of approximately 97.78% of the issued share capital in Holdco, subject to subsequent resale and/or reallocation in accordance with the Scheme;

- the cancellation of all existing Notes (resulting in the reduction of the Group's outstanding debt) and the release of all obligations of Codere UK, Codere Finance, and each Guarantor in respect thereof;

- the USD equivalent of €200 million of additional capital being raised by selling additional New Second Lien Notes to certain Noteholders or their nominees for cash (the "New Cash Notes Purchase");

- the USD equivalent of €200 million of additional capital being raised by selling to certain Noteholders (the "New Senior Private Notes Subscription") new first-lien senior private notes (the "New Senior Private Notes") to be issued initially by New Codere Finance and subsequently assumed by a wholly-owned, newly-formed, indirect subsidiary of Holdco ("Luxco2");

- an agreed-upon reallocation of the New Second Lien Notes (including the New Cash Notes), New Third Lien Notes and Holdco shares among Scheme Creditors and others, as more fully described in paragraphs 45-48 below;

- the purchase by José Antonio Martinez Sampedro and Javier Martinez Sampedro (the "Key Executives") of 19.1875% of the issued ordinary share capital of Holdco from Noteholders (to be reallocated from the 97.78% received by Noteholders) (the "Key Executives Share Purchase");

- the introduction of a new corporate structure,[3] pursuant to (1) a "hive down" of the assets and liabilities of Holdco to new wholly owned subsidiary of Holdco, to be incorporated under the laws of Spain ("Spanish Newco") in accordance with article 72 of the Spanish Structural Reorganization Law, and, thereafter (2) the transfer by Holdco of Spanish Newco to a newly incorporated direct wholly-owned Luxembourg subsidiary of Holdco ("Luxco 2") and, subsequently, (3) the transfer of Luxco 2 by Holdco to a newly incorporated direct wholly-owned Luxembourg subsidiary of Holdco ("Luxco 1") (in each case pursuant to a share-for-share exchange) to effect the revised holding structure of the Group; and

- the implementation of new shareholder arrangements and entry into a shareholders' agreement governing the relationship and actions of the post-Restructuring holders of shares in Holdco.

Foreign Rep. Decl. ¶ 26.

### E.    Schemes of Arrangement Under the Laws of England and Wales

27.    A scheme of arrangement is a proceeding under the laws of England and Wales that allows companies to effect compromises or arrangements, including restructuring their liabilities, with their members and/or creditors (or any class of them).  The Scheme proposed in respect of the Debtor is between the Debtor and certain of its creditors.  Schemes are available in the situation where a company is insolvent, but also where no grounds for insolvency exist. UK Decl. ¶¶ 6-7.

28.    The scheme process formally begins when a company issues an application to the UK Court requesting a hearing to seek permission to convene a creditors' meeting (or meetings)

---

[3] For a diagram of the corporate structure following the Restructuring, please see Part N (*Group Structure Pre and Post Restructuring*) of the approved form of Scheme Document, which is attached to the Foreign Representative Declaration as Exhibit G.

to vote upon a "compromise" or "arrangement" between it and such creditors in accordance with Part 26 of the Companies Act 2006 (the "Convening Hearing").  At the Convening Hearing, the UK Court decides whether to order that a creditors' meeting be convened to consider and vote upon the proposed scheme (the "Convening Order").  UK Decl. ¶ 8.

29.    Any such Convening Order must rest on, among other things, a finding of requisite jurisdiction. The UK Court will have such jurisdiction in the first instance where the debtor is incorporated in England and Wales.  Although the UK Court may ultimately decline jurisdiction in its discretion in deciding whether to sanction the Scheme at the Sanction Hearing, any question as to jurisdiction will have been resolved by the UK Court before this Court holds a final hearing on the Relief Requested. In addition, the UK Court must be reasonably assured that the scheme will be recognized and given effect in each relevant foreign jurisdiction where the scheme company (and any co-obligors who will be released from obligations pursuant to the terms of, or in connection with, the scheme) have material assets or could otherwise be sued for its pre-Scheme debt.  UK Decl. ¶ 9.

30.    Once the UK Court decides to grant permission for a creditors' meeting (or meetings) to be convened, notice of the meeting will be given to creditors whose claims will be compromised in the scheme in accordance with such directions as the UK Court gives in the order.  Such notice must set forth the date, time and place of the creditors' meeting, and an explanatory statement must be distributed to such creditors that contains sufficient information for a typical creditor whose claim is to be compromised by the scheme to make a reasonable decision about whether or not to support the scheme.  The explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of an acceptance or rejection of a chapter 11 plan.  Affected creditors are entitled to attend (in

person or by proxy) and ask questions regarding the proposed scheme at the creditors' meeting. UK Decl. ¶ 10.

31.    The scheme is considered approved at a creditors' meeting only if it is supported by a simple majority (by number) of the creditors present and voting (in person or by proxy) representing at least 75% by value of the votes at such meeting.  All creditors whose claims are to be compromised by the scheme are entitled to vote.  Non-consenting creditors can be bound by the terms of a scheme only if they are within a class of creditors that has voted in favour of the scheme.  UK Decl. ¶ 11.

32.    In order for the scheme to become binding on the creditors following the appropriate meetings, it must also be sanctioned by the UK Court at a fairness or "sanction" hearing (the "Sanction Hearing"), which is comparable to a confirmation hearing under section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3020(b)(2).  All affected creditors have an opportunity to raise questions and objections to the scheme and present evidence at the Sanction Hearing.  UK Decl. ¶ 13.

33.    The UK Court has full discretion to grant or withhold its sanction of the scheme at the Sanction Hearing.  At the Sanction Hearing, the UK Court will consider whether:  (a) the scheme, overall, is fair, taking into account the interests of the creditors and the nature of the scheme's impact upon any dissenting creditors; and (b) the applicable statutory requirements are met, including whether the requisite majorities of voting Scheme Creditors have approved the scheme.  The UK Court is also entitled to give further consideration as to its jurisdiction to sanction the Scheme. UK Decl. ¶ 14.

34.    If the UK Court sanctions a scheme, it will take effect, in accordance with its terms, once a certified copy of the UK Court's order sanctioning the scheme has been delivered

to the Registrar of Companies for England and Wales.  It will then apply to, and be effective

upon, all creditors in the relevant class or classes compromised by the scheme, irrespective of

whether or not they took part in the creditors' meeting or meetings and whether or not they voted

in favor of the scheme.  UK Decl. ¶ 15.

35.    It is now well-established that a company, through an English scheme of

arrangement, may require its creditors to release claims against third parties as part of the

compromise or arrangement provided for by the scheme where the third parties are liable on the

same debt being compromised under the scheme.  The UK Court will, however, only sanction a

scheme which releases claims against third parties where it is satisfied that the release of rights

against third parties is necessary to give effect to the arrangement proposed for the disposition of

the debts and liabilities of the company.  UK Decl. ¶ 16.

36.    A scheme that varies or releases creditors' claims against the debtor company on

terms requiring such creditors to bring into account, and release rights of action against third

parties designed to recover the same loss (such as in the form of claims against co-obligors) is

commonplace in English schemes of arrangement.  Such a release ensures, among other things,

that the company is free from claims for indemnities that might otherwise be brought against it

by the guarantors in due course, which claims would undermine the arrangement provided for in

the scheme in respect of direct claims against the company.  It is also commonplace that schemes

of arrangement provide for the release of any claims against third parties that may arise from the

steps taken in connection with the restructuring.  UK Decl. ¶ 17.

37.    As a matter of English law, non-UK creditors have the same rights to participate

in and vote at the creditors' meetings, participate at and raise questions and issues at the UK

Court hearings in relation to the scheme, and appeal the UK Court's orders, if any, as creditors

from the UK.  UK Decl. ¶ 19.

**F.      Commencement of the UK Proceeding and Activity to Date**

38.      The Debtor applied to the UK Court on October 29, 2015, for an order directing it

to convene a meeting (the "Scheme Meeting") for a single class of creditors only, namely

Noteholders as of the "Record Time" under the Scheme (the "Scheme Creditors").  The Scheme

Creditors are the only creditors whose claims will be compromised by the Scheme.  The purpose

of the proposed Scheme Meeting is to consider and, if appropriate, approve the Scheme.  Foreign

Rep. Decl. ¶ 30.

39.      Notice of the application was given to the Scheme Creditors by means of a

"practice statement" letter (the "Practice Statement Letter") dated September 1, 2015, as

supplemented on October 6, 2015 and October 19, 2015.[4]  The Practice Statement Letter was

addressed to the Trustee and the Scheme Creditors and was published and noticed to the Scheme

Creditors by:

- sending it to Lucid Issuer Services Limited (the "Information Agent") for the purpose of the Information Agent;

- distributing it to Scheme Creditors via Euroclear Bank S.A./N.V. ("Euroclear"), Clearstream Banking *société anonyme* ("Clearstream") and the Depository Trust Company ("DTC"); and

- making it available at www.lucid-is.com/codere (the "Information Agent Website") and at the offices of the Information Agent;

- Codere making it available on the Codere website; and

- announcing it via the Irish Stock Exchange, where the existing Notes are listed.

Foreign Rep. Decl. ¶ 31.

---

[4]  A copy of the Practice Statement Letter, including the supplements thereto, is attached to the
Foreign Representative Declaration as Exhibit F.

40.    The Practice Statement Letter notified the Scheme Creditors of salient facts
relating to the restructuring, including:

(a)    Codere UK's decision to propose the Scheme;

(b)    the objectives of the proposed Scheme;

(c)    Codere UK's intention to apply to the Court to seek an order convening
the Scheme Meeting for the purpose of considering and, if thought fit,
approving the Scheme;

(d)    the intended class composition of the Scheme Meeting;

(e)    the intention to seek Chapter 15 relief in the United States; and

(f)    the indicative timing of the Convening Hearing.

Foreign Rep. Decl. ¶ 33.

41.    On October 29, 2015, the UK Court held a hearing and subsequently issued the
Convening Court Order.  The UK Court found that it could exercise jurisdiction over the Scheme
(subject to its final determination at the Sanction Hearing). The Convening Court Order also (i)
confirms that the Scheme Meeting will be held on a time and date to be advised to Scheme
Creditors on no less than 20 Business Days' notice, which date shall be no earlier than 14
December 2015 and no later than 31 January 2016, at the offices of Clifford Chance LLP, 10
Upper Bank Street, London, E14 5JJ, (ii) confirms the documents and notices that will be sent to
the Scheme Creditors, and (iii) declared that the Petitioner is authorized to act as foreign
representative in respect of the UK Proceeding, including in any chapter 15 proceeding.  Foreign
Rep. Decl. ¶ 34.

42.    The Convening Order requires that, at least 20 business days prior to the Scheme
Meeting, Codere UK issue a document (the "Scheme Document") containing, amongst other
things:

(a)    formal notice confirming the date, time, place and purpose of the Scheme Meeting;

(b)    the terms of the Scheme; and

(c)    the statement explaining the terms of the Scheme.

Foreign Rep. Decl. ¶ 35.

43.    In accordance with the Convening Court Order, the Scheme Document was sent to the Information Agent for the purpose of the Information Agent making it available on the Information Agent Website.  In addition, the notice of the Scheme Meeting was circulated to Scheme Creditors (a) by the delivery of such notice to Euroclear, Clearstream and DTC, (b) via the Regulated News Service operated by the Irish Stock Exchange, and (c) as otherwise required by the rules of the Irish Stock Exchange.  The Scheme Document will also be made available for inspection by a Scheme Creditor at the offices of Clifford Chance LLP, 10 Upper Bank Street, London E14 5JJ.  Foreign Rep. Decl. ¶ 36.

44.    Hard copies of the Scheme Document will also be available:  (a) for inspection by Scheme Creditors at the offices of Clifford Chance LLP, during business hours for at least 20 business days before the date of the Scheme Meeting; and (b) provided free of charge upon written request made by a Scheme Creditor to Clifford Chance LLP until the date of the Scheme Meeting at the Debtor's expense.  Foreign Rep. Decl. ¶ 37.

**G.    Implementation of the Scheme and the Restructuring**

45.    If the Restructuring is implemented, all outstanding liabilities in respect of the existing Notes (including both principal and unpaid interest) will be treated as follows:

(a)    €475 million will be cancelled in return for €150 million of New Second Lien Notes and €325 million of New Third Lien Notes; and

(b)    all remaining and outstanding liabilities under the Notes will be cancelled in return for approximately 97.78% of the ordinary shares in Holdco (the "Holdco Capitalization"),

in each case, to be allocated *pro rata* to Noteholders in accordance with their holding of Notes,

subject to the reallocations described below.  Foreign Rep. Decl. ¶ 38.

46.    The reallocations are the result of specific agreements by the consenting

Noteholders that are embodied in the Scheme.  In particular, in connection with the restructuring,

certain investors have committed to underwrite the New Cash Notes Purchase (the "New Cash

Notes Backstop Providers") and the New Senior Private Notes Subscription (the "New Senior

Private Notes Backstop Providers").  Foreign Rep. Decl. ¶ 39.  As consideration therefor, the

New Cash Notes Backstop Providers and the New Senior Private Notes Backstop Providers will

be entitled to 9.80% and .98% of the Holdco shares respectively.  Foreign Rep. Decl. ¶ 42.  Also,

to preserve the value of the new notes being issued to Scheme Creditors, and to maximize the

future value of the Group as a whole, the consenting Noteholders reached an agreement with the

two Key Executives:  José Antonio Martinez Sampedro, the Chairman and CEO of the Group,

and Javier Martinez Sampedro, a director and Head of Latin American Operations for the Group.

Under the agreement, the Key Executives will purchase, and the Scheme Creditors will sell,

19.1875% of the Holdco shares for €500,000, with the proceeds of the sale distributed to Scheme

Creditors.  Foreign Rep. Decl. ¶ 40.  This sale ensures the continuation of the Key Executives'

ownership of certain shares in Holdco, which is important to align their interests with those of

the Group and in the context of institutional and governmental relationships considered

necessary to the Group's licensed businesses.  *Id*.  The sale was subject to significant commercial

negotiation and was approved by the consenting Noteholders pursuant to the Lock-Up

Agreement.  *Id*.

47.    In addition, since early 2013, Silver Point Finance, LLC — as global coordinator

pursuant to the Lock-Up Agreement (the "Global Coordinator") — has facilitated the

development of ideas and communications among Holdco, the Ad Hoc Committee and the other

Noteholders, and their advisors, in respect of the Restructuring.  In consideration of the role and

work undertaken by it, the Global Coordinator will be issued an entitlement to shares in Holdco

in an amount equal to 2% of the post-Restructuring equity of Holdco.  Foreign Rep. Decl. ¶ 41.

48.    Accordingly, pursuant to the Scheme and related agreements, each Noteholder,

each purchaser of New Cash Notes and each New Cash Notes Backstop Provider will

irrevocably direct that the New Second Lien Notes (including the New Cash Notes), the New

Third Lien Notes and the Holdco Shares will be reallocated such that:

(a)    Scheme Creditors who exercised their right to participate in the New Cash
Notes Purchase will have priority in receiving New Second Lien Notes
*pro rata* in exchange for their existing Notes; and

(b)    the Holdco shares to which Scheme Creditors would otherwise be entitled
will be allocated so the shares in Holdco will ultimately be distributed as
follows:

(i)    59.977% by the New Cash Notes Purchasers;

(ii)    3.92% by Noteholders holding New Second Lien Notes;

(iii)    1.96% by Noteholders holding New Third Lien Notes;

(iv)    9.80% by the New Cash Notes Backstop Providers;

(v)    0.98% by the New Senior Private Notes Backstop Providers;

(vi)    19.1875% by the Key Executives;

(vii)    2.176% by the existing shareholders of Holdco; and

(viii)    2.00% by the Global Coordinator.

Foreign Rep. Decl. ¶ 42.

49.    The Restructuring is conditional on, among other things, delivery of the Scheme

Sanction Order to the Registrar of Companies for England and Wales for registration in respect

of the Scheme and the granting of the Chapter 15 Order.  Foreign Rep. Decl. ¶ 43.

50.     Should the Scheme not be approved, it is likely that Group-wide insolvency

proceedings shall commence shortly thereafter and that the recoveries for Noteholders will be

significantly less than if the Scheme and the Restructuring are implemented.  Foreign Rep. Decl.

¶ 44.

**H.      Codere's Connections to the United States and Need for Chapter 15 Relief**

51.     Codere UK has assets in the Southern District of New York in the form of

$50,000 currently on deposit in a Wachtell, Lipton, Rosen & Katz client trust account (the

"Client Trust Account") at the New York, New York branch of JPMorgan Chase Bank, N.A.

Foreign Rep. Decl. ¶ 46.

52.     In addition, as noted above, the Indentures and the Notes are, by their terms,

governed by New York law.  Foreign Rep. Decl. Ex. E, §14.08.  The Issuers and the Guarantors

have also expressly consented to the jurisdiction of any federal or state court located in the

Borough of Manhattan, New York, New York and have appointed CT Corporation System, with

offices at 111 Eighth Avenue, New York, New York 10011, or any successor, as its agent for

service of process in actions arising out of the Indenture or transactions contemplated thereby.

Foreign Rep. Decl. Ex. E, §14.09.  Many of the Noteholders, including the Global Coordinator,

are based in the United States.  Foreign Rep. Decl. ¶ 47.

53.     The purpose of recognition of the Scheme in the United States is to help ensure

the enforceability and effectiveness of the Scheme in the United States.  The Debtor, the other

members of the Group and the Ad Hoc Committee wish to ensure that no creditors can bypass

the effect of the Scheme by commencing litigation or taking other actions in the United States to

obtain a greater recovery than other, similarly situated creditors.  Although the Debtor is not now

a party to litigation in the United States, implementation of the Scheme is important to the

Restructuring, and obtaining this Court's recognition and enforcement of the Scheme, together

with other related relief requested herein, is a non-waivable condition under the terms of the
Scheme for the Restructuring to become effective.  Foreign Rep. Decl. ¶ 48.

54.     Time is limited if the Restructuring is to be successfully executed.  While the
Lock-Up Agreement currently prevents the majority of Noteholders from taking enforcement
actions, a minority of Noteholders have not signed the Lock-Up Agreement such that it is
possible that they may seek to take enforcement action.  Moreover, after December 31, 2015 (the
"Longstop Date"), even those Noteholders who are party to the Lock-Up Agreement could seek
to take enforcement action unless the UK Court has sanctioned the Scheme by that date or the
Longstop Date has been extended in accordance with the terms of the Lock-Up Agreement.
Foreign Rep. Decl. ¶ 49.  In addition, a failure to complete the Restructuring within the proposed
timeframe is likely to attract negative attention, with a detrimental impact upon the Group and
key stakeholders, including suppliers, employees and customers.  Foreign Rep. Decl. ¶ 50.

## JURISDICTION AND VENUE

55.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)
and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012
(Preska, C.J.).

56.     This case has been properly commenced pursuant to section 1504 of the
Bankruptcy Code by the filing of the Petition for recognition of the UK Proceeding under section
1515 of the Bankruptcy Code.

57.     Venue is proper in this district.  Section 1410 of title 28 of the United States Code
provides as follows:

A case under chapter 15 of title 11 may be commenced in the district court of the
United States for the district—

(1)  in which the debtor has its principal place of business or principal assets in
the United States;

(2)  if the debtor does not have a place of business or assets in the United States,
in which there is pending against the debtor an action or proceeding in a Federal
or State court; or

(3)  in a case other than those specified in paragraph (1) or (2), in which venue
will be consistent with the interests of justice and the convenience of the parties,
having regard to the relief sought by the foreign representative.

58.     As discussed in paragraph 51 above, the Debtor's assets in the United States

include entitlements to deposits in bank accounts in the Southern District of New York.  The

Debtor has no place of business or litigation pending against it in the United States.

## RELIEF REQUESTED

59.     The Petitioner respectfully requests that this Court enter an order, substantially in

the form of the proposed order attached hereto as Exhibit A, pursuant to sections 105(a), 1507(a),

1509(b)(2)-(3), 1515, 1517, 1520, 1521(a) and 1525(a) of the Bankruptcy Code that:

(a)     recognizes the UK Proceeding as a foreign main proceeding (as defined in
section 1502 of the Bankruptcy Code) and grants the Debtor all of the
relief afforded to such proceedings pursuant to section 1520 of the
Bankruptcy Code;

(b)     recognizes the Petitioner as a "foreign representative" as defined in section
101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(c)     entrusts the administration of any and all of the Debtor's assets within the
territorial jurisdiction of the United States to the Petitioner;

(d)     provides that the Scheme Sanction Order and the Restructuring
Documents (each as defined in the Scheme) are recognized, granted
comity, and entitled to full force and effect against all entities (as that term
is defined in section 101(15) of the Bankruptcy Code) in accordance with
their terms, and that such terms shall be binding and fully enforceable on
all Scheme Creditors, Backstop Providers, the Funding Parties and any of
their Nominated Recipients (each as defined in the Scheme);

(e)     provides that any judgment, wherever and whenever obtained, to the
extent such judgment is a determination of the liability of the Debtor or
any other person released under or pursuant to the Scheme, including, as

applicable, the Protected Parties (as defined in the Explanatory Statement) (collectively, the "Debtor Parties"), with respect to any debt cancelled, discharged or restructured under or pursuant to the Scheme, the Restructuring Documents or as a result of English law relating to the Restructuring is unenforceable in the United States, in each case, to the extent inconsistent with the Scheme, the Restructuring Documents or such law;

(f)     permanently enjoins all Scheme Creditors, the Backstop Parties, the Funding Parties, and any of their Nominated Recipients from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, any judicial, quasi-judicial, arbitral or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act to collect, recover or offset any debt cancelled, discharged or restructured under the Scheme or Restructuring Documents and/or as a result of English law relating to the Restructuring, or seeking any discovery related thereto, in each case, to the extent inconsistent with the Scheme, the Restructuring Documents or such law;

(g)     permanently enjoins Scheme Creditors, the Backstop Parties, the Funding Parties, and any of their Nominated Recipients from (i) transferring, relinquishing or disposing of any property of the Debtor Parties located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of or exercise control over, such property, in each case, to the extent inconsistent with the Scheme, the Restructuring Documents or English law relating to the Restructuring;

(h)     permanently enjoins the commencement of any suit, action or proceeding in the territorial jurisdiction of the United States to resolve any dispute arising out of any provision of the Scheme, the Restructuring Documents or English law relating to the Restructuring;

(i)     permanently enjoins all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the U.S. Bankruptcy Court's jurisdiction from taking any action inconsistent with the Scheme, including, without limitation, against the Debtor Parties or any property of Debtor Parties within the territorial jurisdiction of the United States;

(j)     permanently enjoins Scheme Creditors, the Backstop Parties, the Funding Parties, and any of their Nominated Recipients from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), or employing any process, against

the Foreign Representative (personally or in such capacity), the Debtor or the other Debtor Parties in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in connection with this chapter 15 case, the Scheme or the Restructuring Documents;

(k)   provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with the Scheme, the Restructuring Documents, any order entered in respect of this Petition, the chapter 15 case, any further order for additional relief in the chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

(l)   provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of such order; and

(m)   provides such other and further relief as the Court deems proper and just (together with sub-paragraphs a through l, the "Relief Requested").

## BASES FOR RELIEF

60.   The Relief Requested is based on the provisions of chapter 15 of title 11 of the United States Code (and certain other provisions of the Bankruptcy Code) discussed below. As directed by the statute, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.[5]

### A.   The UK Proceeding Should Be Recognized as a Foreign Main Proceeding

61.   Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if: (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of

---

[5]  The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." H. Rep. No. 109-31, pt. 1, at 109-110 (2005).

the Bankruptcy Code; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). The UK Proceeding, the Petitioner and this Petition satisfy all of the foregoing requirements.

### i.    The UK Proceeding Is a Foreign Main Proceeding

62.    The UK Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

63.    As a threshold matter, the UK Proceeding comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code, which states:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

64.    Section 101(23) requires that a "foreign proceeding" be (1) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23). The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." *See* 11 U.S.C. § 1502(3).

65.    The UK Proceeding qualifies as a "foreign proceeding." Section 1516(a) of the Bankruptcy Code entitles this Court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so indicates. *See* 11 U.S.C. §§ 1516(a), 1515(b)(1). Here, the UK Court recognized in the Convening Court Order that the

Petitioner "is appointed the foreign representative of [Codere UK] in any petition brought by

[Codere UK] before the United States Bankruptcy Court in the Southern District of New York or

other appropriate forum for an order recognizing the Scheme as a 'foreign main proceeding'

under Chapter 15 of the U.S. Bankruptcy Code and recognising the Scheme and granting it

comity in the United States." Convening Court Order ¶ 22.

66.     In any event, the UK Proceeding readily meets the statutory definition of a

"foreign proceeding." The UK Proceeding is "collective" in the sense that it involves all Scheme

Creditors and requires a majority in number of the voting Scheme Creditors representing at least

three-quarters in amount of the Scheme Claims to vote in favor of the Scheme for the

Restructuring to proceed. The UK Proceeding is also a "judicial" proceeding: it is predicated on

the Convening Court Order and will require the Scheme Sanction Order for the Scheme to be

ultimately approved, each issued by the UK Court, a judicial body of the UK. *See* Foreign Rep.

Decl. Ex. G (Section I, Part B, Clause 13.2). In addition, the proposed Scheme has been

launched by the Debtor and a class of creditors (the Scheme Creditors) for the purpose of

effectuating an "adjustment of debt." *Id*. (Section I, Part C, Clause 1.2) ("The principal purpose

of the Scheme is to facilitate the implementation of the Restructuring.").

67.     The UK Proceeding is also pending in a foreign country, England (a constituent

member of the political union comprising the UK), under the supervision of a foreign court, *i.e.*,

the UK Court. The UK Proceeding, moreover, is occurring pursuant to a foreign law (*i.e.*, Part

26 of the Companies Act 2006), that facilitates adjustment of debt for the purpose of

reorganization: in this instance, the exchange of claims against the Debtor for new debt and

equity instruments of the Debtor and its affiliates — a classic restructuring transaction often

implemented in pre-negotiated chapter 11 plans familiar to this Court.

68.     At its 18th session, the UNCITRAL Working Group on Insolvency Law, which

oversaw the drafting of the Model Law of Cross-Border Insolvency on which chapter 15 is

based, stated that the term "foreign proceeding" was meant to include scheme and composition

proceedings such as the UK Proceeding:

> The proposal was made to add to [the definition of "foreign proceeding"] a
> reference to composition proceedings, namely, *proceedings in which indebtedness
> was reduced while the debtor remained in control of its assets.* The Working
> Group hesitated to add such a specific reference to composition proceedings. One
> view in that direction was that the broad category of "reorganization", which
> might be read more as an economic than as a legal term, would widely be
> understood as encompassing composition and other such proceedings. It was felt
> that adding such a specific reference to any particular form of reorganization
> might actually create uncertainty. Furthermore, it was observed that attempting a
> list of reorganization proceedings would run the risk of excluding some types of
> proceedings intended to be covered. *While it was generally agreed that
> composition proceedings should be covered*, the Working Group was not ready to
> reach a definitive decision on how best to achieve that result and deferred
> consideration of the matter to a later stage of its work.

U.N. G.A., United Nations Comm'n on Int'l Trade L., 29th Sess., Rep. of the Working Grp. on

Insolvency Law on the Work of the Eighteenth Sess., ¶ 108, U.N. Doc. A/CN.9/419 (Dec. 1

1995) (emphasis added).

69.     The Bankruptcy Code definition of "foreign proceeding" squarely encompasses

scheme and composition proceedings that involve a restructuring of debt: the statute adds the

non-uniform phrase "or adjustment of debt" to the words "under a law related to insolvency."

11 U.S.C. § 101(234). The legislative history indicates that the change is to emphasize "that the

scope of the Model Law and chapter 15 is not limited to proceedings involving debtors that are

technically insolvent, but broadly includes all proceedings involving debtors in severe financial

distress, so long as those proceedings also meet the other criteria of section 101(24)." H. Rep.

No. 109-31, pt. 1, at 118 (2005).

70.    Accordingly, schemes under English law have routinely been recognized as

foreign proceedings in chapter 15 cases, including in this Court.  *See*, *e.g.*, *In re Towergate*

*Finance*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re New World Resources*

*N.V.*, No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re Hibu Inc.*, No. 14-70323

(REG) (Bankr. E.D.N.Y. Feb. 27, 2014); *In re Zlomrex Int'l Finance S.A.*, No. 13-14138 (Bankr.

S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom B.V.*, No. 13-13508 (SHL) (Bankr. S.D.N.Y.

Dec. 11, 2013); *In re Hellas Telecom.* (*Luxembourg*) *V*, No. 10-13651 (Bankr. D. Del. Dec. 13,

2010); *In re Highlands Ins. Co.* (*U.K.*) *Ltd.*, No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18,

2009); *In re Castle Holdco 4, Ltd.*, No. 09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009); *In re*

*Europaische Rueckversicherungs-Gesellschaft in Zurich*, Case No. 06-13061 (REG) (Bankr.

S.D.N.Y. Jan. 22, 2007); *In re Gordian RunOff* (*UK*) *Ltd., f/k/a GIO* (*UK*) *Ltd.*, No. 06-11563

(RDD) (Bankr. S.D.N.Y. Aug. 29, 2006); *In re Lloyd*, No. 05-60100 (BRL), 2005 WL 3764946

(Bankr. S.D.N.Y. Dec. 7, 2005); *see also In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R.

25, 49-50, 66-68 (Bankr. S.D.N.Y. 1999) (finding a Bermudan scheme of arrangement, which is

similar to a scheme under the UK Companies Act 2006, to be a "foreign proceeding" under

former sections 101(23) and 304 of the Bankruptcy Code).

71.    Beyond qualifying as a "foreign proceeding" under section 101(23), the UK

Proceeding here qualifies as a "foreign main proceeding," which is defined in the Bankruptcy

Code as "a foreign proceeding pending in the country where the debtor has the center of its main

interests."  *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of

recognition as a foreign main proceeding shall be entered if the foreign proceeding "is pending in

the country where the debtor has the center of its main interests").  Under Second Circuit law,

the relevant time period to consider in determining the location of a debtor's "center of main

interests" ("COMI") is "the date on which the chapter 15 petition was filed." *See Morning Mist Holdings Ltd.* v. *Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 135 (2d Cir. 2013).

72.    The Bankruptcy Code presumes that a debtor's "registered office" is its COMI "[i]n the absence of evidence to the contrary." *See* 11 U.S.C. § 1516(c).  In evaluating a debtor's COMI, the Court of Appeals has held that "the relevant principle . . . is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties . . . . Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Fairfield Sentry*, 714 F.3d at 130.

73.    England — a constituent member of the political union comprising the UK — is the COMI of Codere UK.  Codere UK is incorporated under the laws of England and Wales and conducts its official business, including board meetings, in England.  Foreign Rep. Decl. ¶ 4. Accordingly, there is no basis to rebut the presumption that the UK is the Debtor's COMI. Codere UK's "nerve center" and its "locus of operations" have been in the UK since before the commencement of the UK Proceeding and remain there as of the filing of this Petition.

74.    Moreover, the fact that the UK is Codere UK's center of main interests is readily ascertainable by creditors and third parties.  Since its formation, Codere UK has:

- been holding board meetings in London;

- conducted creditor negotiations in London;

- received mail and facsimiles in, and sent its mail and facsimiles from, London, and conducted its other administrative functions there;

- used a London address, phone number and fax number;

- had a majority of directors who are UK residents;

- maintained its books, records and corporate documents at its London address;

- held funds in its UK bank accounts; and

- been subject to UK corporation tax.

Codere UK also leases space in London and not in any other jurisdiction.

Foreign Rep. Decl. ¶¶ 28-29.

75.     For all of the reasons set forth above, the UK Proceeding is, and should be

recognized as, the foreign main proceeding in respect of the Debtor.

### ii.      The Petitioner Is a Foreign Representative Who is a Person

76.     The second requirement for recognition of a foreign proceeding under section

1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a

"person or body."  11 U.S.C. § 1517(a)(2).

77.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy

Code as "a person or body, including a person or body appointed on an interim basis, authorized

in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets

or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).  Under

section 101(41), the "term 'person' includes [an] individual . . . ."  11 U.S.C. § 101(41).

78.     The Petitioner, David Jiménez Márquez, is an individual who has been

(1) appointed by the Debtor's board as foreign representative of the UK Proceeding, and

(2) declared as authorized to act as the Debtor's "foreign representative" pursuant to the

Convening Court Order.  Foreign Rep. Decl. ¶ 2.  Thus, he satisfies the second requirement for

entry of an order recognizing the UK Proceeding as a foreign main proceeding.

### iii.      The Petition Meets the Requirements of Section 1515

79.     The third and final requirement for recognition of a foreign proceeding under

section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural

requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).

80.     Here, all of the requirements of section 1515 of the Bankruptcy Code have been

met.  First, the Debtor's chapter 15 case was duly and properly commenced by the Petitioner

through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

81.     Second, evidence of the existence of the UK Proceeding and the appointment of

the Petitioner as the foreign representative have been provided to the Court as required under

section 1515(b)(1) and (d) of the Bankruptcy Code.  *See* Exhibits A and B to the Foreign

Representative Declaration (true and correct copies of the Resolution of Appointment and the

Convening Court Order).

82.     Third, in accordance with section 1515(c) of the Bankruptcy Code, the Foreign

Representative Declaration contains a statement identifying the UK Proceeding as the only

foreign proceeding currently pending with respect to the Debtor.  *See* Foreign Rep. Decl. ¶ 52.

83.     Accordingly, each of the requirements of section 1517(a) has been satisfied, and

entry of an order recognizing the UK Proceeding as a foreign main proceeding is proper.

**B.      The Debtor Is Entitled to Automatic Relief Under 11 U.S.C. § 1520.**

84.     Section 1520(a) of the Bankruptcy Code sets forth statutory protections that

automatically result from the recognition of a foreign proceeding as a foreign main proceeding,

*see* 11 U.S.C. § 1520(a), including the application of the automatic stay under section 362(a) of

the Bankruptcy Code to the Debtor and its property within the territorial jurisdiction of the

United States.  Thus, once the Court recognizes the UK Proceeding as a foreign main

proceeding, no further showing is required to obtain such protections.

**C.      Discretionary Relief Should Also Be Granted.**

85.     Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to

grant "any appropriate relief" at the request of the recognized foreign representative "where

necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the

interests of the creditors." 11 U.S.C. § 1521(a).  Such relief may "include[e]"[6]

> (1)    staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

> (2)    staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

> (3)    suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) . . . ; and

> (7)    granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) . . . .

*Id.*  The Court may grant relief under section 1521(a) if the interests of "the creditors and other

interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).

86.    In granting discretionary relief, the Court may also act pursuant to section 1507 to

provide "additional assistance" to a foreign representative under the Bankruptcy Code or other

U.S. law.  11 U.S.C. § 1507(a).  The legislative history of section 1507 states that it provides

authority for "additional relief" beyond that permitted under sections 1519 to 1521.[7]  Section

1507(b) provides that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

> (1)    just treatment of all holders of claims against or interests in the debtor's property;

> (2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

> (3)    prevention of preferential or fraudulent dispositions of property of the debtor;

> (4)    distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

---

[6] The term "including" (as set forth in section 1521(a)) is not limiting.  *See* 11 U.S.C. § 102(3).
[7] H.R. Rep. No. 109-31, pt. 1, at 109 (2005).

(5)    if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).[8]

87.    For the reasons that follow, the Petitioner respectfully urges this Court to exercise its power under sections 1521 and 1507 to grant the Relief Requested that goes beyond the automatic relief provided by section 1520.

### i.    Purpose of Discretionary Relief

88.    The discretionary Relief Requested is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is necessary to the Restructuring and implementation of the Scheme.

89.    For the Restructuring to be effective, all Scheme Creditors must be bound by the terms of the Scheme and other Restructuring Documents as sanctioned by the UK Court and the laws of England and Wales.  As the Second Circuit has recognized, "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix S.S. Co., S.A.* v. *Salen Dry Cargo A.B.*, 825 F.2d 709, 713-4 (2d Cir. 1987); *see also Cunard S.S. Co.* v. *Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").  Over a hundred years ago, the Supreme Court recognized the need to give effect to foreign schemes of arrangement in order to further these goals, reasoning that

---

[8] Section 1507(b) of the Bankruptcy Code substantially incorporates the factors set forth in former section 304(c) of the Bankruptcy Code that courts considered in deciding whether to grant relief under former section 304(b) (11 U.S.C. § 304, repealed by Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, tit. VIII, § 802(d)(3), 119 Stat. 23, 146 (2005) on April 20, 2005, repeal effective October 17, 2005).

[u]nless all parties in interest, wherever they reside, can be bound by the
arrangement which it is sought to have legalized, the scheme may fail. All home
creditors can be bound. What is needed is to bind those who are abroad. Under
these circumstances the true spirit of international comity requires that schemes of
this character, legalized at home, should be recognized in other countries.

*Canada S. Ry. Co.* v. *Gebhard*, 109 U.S. 527, 539 (1883).

90.     Here, the Relief Requested is intended to preclude Scheme Creditors from seeking

judgments in the United States against the Debtor, co-obligors, or others involved in the

Restructuring to obtain more than they are entitled to under the Scheme and the Restructuring

Documents. If Scheme Creditors could evade the terms of the Scheme by commencing actions

in the United States, the Debtor or other members of the Group could be required to defend such

proceedings, thereby depleting the resources of the restructured business and reducing its

reorganized value. The Relief Requested is required to prevent individual Scheme Creditors

(95.1% of whom have consented to the Restructuring pursuant to the Lock-Up Agreement) from

acting to frustrate the purposes of the Scheme.

**ii.     Injunctive Relief Is Appropriate.**

91.     To the extent the standards for injunctive relief apply in this chapter 15 case to the

Relief Requested, those standards are met. Injunctive relief is appropriate where the movant can

show a likelihood of irreparable harm. Irreparable harm to an estate exists where the "equitable

and orderly distribution of a debtor's property" are disrupted. *Victrix*, 825 F.2d at 713-14.[9]

---

[9]   *See also In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("irreparable harm is
present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims
and fair distribution of assets in a single, centralized forum" (quoting 2 Collier on Bankruptcy
¶ 304.05, at 304-21 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2003)); *In re MMG
LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local
creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the
detriment of other creditors."); *In re Rubin*, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) ("[T]here
appears to be little dispute regarding the notion that the premature piecing out of property
involved in a foreign liquidation proceeding constitutes irreparable injury," quoting *In re Lines*,
*infra*); *In re Brierley*, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from

92.     Courts in this District have thus repeatedly recognized their authority to grant injunctive relief to enforce foreign plans and discharges. *See, e.g.*, *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25 (Bankr. S.D.N.Y. 1999) (extending injunction of Bermuda court to prohibit any creditor from commencing or continuing actions in the United States contrary to the Bermudan plan); *Brierley*, 145 B.R. at 168-69 (granting permanent injunction prohibiting suits against the foreign debtor, its property or its administrators arising out of claims which could have been asserted prior to the filing of the ancillary petition); *see also Argo Fund Ltd*. v. *Bd. of Dirs. of Telecom Arg., S.A.* (*In re Bd. of Dirs. of Telecom Arg., S.A.*), 528 F.3d 162 (2d Cir. 2008) (bankruptcy court properly exercised discretion in granting full force and effect to an Argentine plan and approval order in the United States).

93.     If the Restructuring as contemplated by the Scheme and the Restructuring Documents is not given effect in the United States, Scheme Creditors could bring proceedings in the United States against the Debtor or other parties protected by the Scheme based upon the governing Indentures' consent-to-jurisdiction in New York clauses.  Such proceedings would undermine the integrity of the Scheme and the Restructuring.

**iii.     Granting the Relief Requested Will Leave Creditors and Other
Parties in Interest "Sufficiently Protected" and Will Not Be
<ins>"Manifestly Contrary to the Public Policy of the United States."</ins>**

94.     The Relief Requested under section 1521 is founded on the congressional mandate to cooperate with foreign proceedings and foreign representatives to promote the goals of chapter 15.  *See* 11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or

---

the failure to grant injunctive relief in the form of disruption of an orderly determination of claims and the fair distribution of assets in a single case."  (internal quotation marks and citation omitted)); *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.").

through the trustee."). Courts may afford comity to foreign proceedings as long as the interests

of "the creditors and other interested entities, including the debtor, are sufficiently protected."

11 U.S.C. § 1522(a). Although the Bankruptcy Code does not define "sufficient protection,"

legislative history indicates that a foreign plan may be approved unless "it is shown that the . . .

proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31,

pt. 1, at 116 (2005).

95.    Here, all creditors are "sufficiently protected" by the Scheme, the Restructuring

Documents, and the UK Proceeding. All Scheme Creditors will be treated similarly and there is

no contention that the U.S. claimants are being subjected to prejudice or inconvenience. The

Relief Requested "would assist in the efficient administration of" the UK Proceeding and "would

not harm the interests of the debtors or their creditors." *In re Grant Forest Prods., Inc.*, 440 B.R.

616, 621 (Bankr. D. Del. 2010).

96.    The Relief Requested also comports with section 1506 of the Bankruptcy Code,

which allows courts to deny comity to foreign proceedings in the limited circumstance where

doing so "would be manifestly contrary to the public policy of the United States." *See* 11 U.S.C.

§ 1506. Congress has made clear that section 1506's public policy exception is to be construed

narrowly, applying only to the "most fundamental policies of the United States." H. Rep. No.

109-31, pt. 1, at 109 (2005). Put simply, "[a]s long as the manner in which the scheme acquired

statutory effect comports with our notions of procedural fairness, comity should be extended to

it." *Hopewell*, 238 B.R. at 56-61.

97.    Under this standard, the mere fact that a foreign representative requests relief that

would not be available in the United States is not grounds for denying comity under section

1506. *See*, *e.g.*, *In re Condor Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010); *see also Telecom*

*Argentina*, 528 F.3d at 173 (stating that comity "does not require that foreign proceedings afford

a creditor identical protections as under U.S. bankruptcy law"); *In re Metcalfe & Mansfield Alt.*

*Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) ("The relief granted in the foreign proceeding

and the relief available in a U.S. proceeding need not be identical.").

98.     In this case, much of the Relief Requested would also be available under a chapter

11 plan of reorganization.  The terms of the Scheme, however, do provide for releases in favor of

third parties, including obligors other than the Debtor.  Although such releases are not routinely

granted in chapter 11 cases,[10] they are commonplace in UK schemes of arrangement, and English

courts have well-developed laws and practices to assess such releases.  *See* UK Decl. ¶¶ 16-17;

*see also, e.g., Re Lehman Bros Int'l (Europe)*, [2009] EWCA Civ. 1161; *Re La Seda de*

*Barcelona*, [2010] EWHC 1364 (Ch).

99.     English law provides strong grounds for the UK Court to sanction the release,

under and in connection with the Scheme, of non-debtors, including co-issuer Codere Finance

and affiliated guarantors.  As will be shown in the UK Proceedings, if Scheme Creditors could

press their discharged Scheme Claims against those co-obligors, the Restructuring would fail.

The enterprise value of the Group would be significantly reduced, because:  (a) the other

obligors' liabilities in respect of the Notes would be difficult, if not impossible, to restructure;

and (b) given its financial situation, Codere would risk being subject to creditor remedies and

liquidation.  *See supra* ¶¶ 29, 36; Foreign Rep. Decl. ¶ 45.  The non-Debtor releases (including in

favor of co-obligors and guarantors) in the Scheme are an essential part of a solution that

---

[10] In the Second Circuit, a court may enjoin a creditor from suing a third party only if "the
injunction plays an important part in the debtor's reorganization plan," *SEC* v. *Drexel Burnham
Lambert Group, Inc.* (*In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir.
1992), and only in "rare" cases, *Deutsche Bank AG* v. *Metromedia Fiber Network, Inc.* (*In re
Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141 (2d Cir. 2005).

maximizes enterprise value without prejudice to the rights of creditors, as evidenced by more than 95.1% of Noteholders signing the Lock-Up Agreement. The Debtor, therefore, will request that the U.K. Court sanction the Scheme, including the co-obligor and third party releases, before this Court holds a final hearing on the Relief Requested. Foreign Rep. Decl. ¶ 45.

100.    The inclusion of third-party releases in the UK Scheme is not a basis for denying comity. To the contrary, courts in chapter 15 cases regularly give effect to foreign plans, including UK schemes of arrangement, that include third-party releases. *See, e.g.*, *In re Towergate Finance*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re New World Resources N.V.*, No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014) (UK scheme); *In re Hibu Inc.*, No. 14-70323 (REG) (Bankr. E.D.N.Y. Feb. 27, 2014) (UK scheme); *In re Magyar Telecom B.V.*, No. 13-13508 (SHL) (Bankr. S.D.N.Y. Dec. 11, 2013) (UK scheme); *In re Metcalfe*, 421 B.R. at 700 (Canadian proceeding).

101.    For example, in *Metcalfe*, the monitor in a Canadian restructuring sought recognition under chapter 15 of a scheme that included "a very broad third-party release," which the Canadian court had approved. 421 B.R. at 687-88. The restructuring concerned commercial paper backed by credit default swaps, and the release at issue was designed to benefit the "asset providers" who were counterparties to the debtor under the swaps. *Id.* at 692. The asset providers conditioned their participation in the proceeding on a release not only of themselves but also of all parties against whom the commercial paper investors could have brought suit "because such parties might then [have claims] against the Asset Providers." *Id.* at 692-93.

102.    In evaluating the releases, the *Metcalf* court observed that the correct inquiry was not whether the Canadian scheme could have been approved in a chapter 11 case, but rather "whether the foreign orders should be enforced in the United States." *Id.* at 696. In analyzing

that question, the court emphasized that the "public policy" exception is narrow and that the "key

determination" is "whether the procedures used in Canada [met American] fundamental

standards of fairness." *Id.* at 697.  The court thus considered whether the forum provided "a full

and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular

proceedings, after due citation or voluntary appearance of the defendant, and under a system of

jurisprudence likely to secure an impartial administration of justice between the citizens of its

own country and those of other countries," and whether there was "prejudice in the court, or in

the system of laws under which it is sitting."  *Id*. at 698.  Based on these considerations, the

court concluded that comity should be afforded.  *Id*. at 700.

103.    This case is no different.  The UK Proceeding commenced by the Debtor will

indisputably conform to American notions of due process, which are themselves rooted in the

common law tradition of England.  *See Hopewell*, 238 B.R. at 66 ("[W]hen the foreign

proceeding is in a sister common law jurisdiction with procedures akin to our own, comity

should be extended with less hesitation, there being fewer concerns over the procedural

safeguards employed in those foreign proceedings.") (internal quotation marks and citations

omitted); *accord Metcalfe*, 421 B.R. at 698 (quoting *Hopewell*).

104.    Moreover, the steps to be followed in the UK Proceeding demonstrate a clear

commitment to adequate process.  Notice of the intention to seek the Convening Court Order was

given to Scheme Creditors by way of the practice statement letter, as described in paragraph 40

above.  Notice of the Scheme Meeting was given to Scheme Creditors as further described in

paragraph 39 above.  To the extent any United States creditors were not aware of the UK

Proceeding, notice of this Petition and the Relief Requested herein will be (i) delivered to the

Information Agent for distribution to the Scheme Creditors and (ii) published in the National

Edition of *The Wall Street Journal*, well in advance of the Scheme Meeting and the Sanction

Hearing.  Based on such notices, all Scheme Creditors will have an opportunity to raise any

objections or questions at the Scheme Meeting and, if desired, at the Sanction Hearing.

105.    In addition to the matters set forth above, the Scheme has the following features

that ensure the fairness of the Scheme:

      (a)    the UK Court will consider and determine whether a single class of
            Scheme Creditors is appropriate for the purposes of voting on the Scheme;

      (b)    acceptance of the Scheme requires 75% in value and a majority in number
            of the Scheme Creditors, in each case, of those present and voting;

      (c)    the rights of all Scheme Creditors, in their capacity as Scheme Creditors,
            are identical (subject to the agreed re-allocations described in paragraphs
            45-48 , which recognize certain parties' contributions to the Restructuring
            and the preservation of company value), and there will be no "cramdown"
            of a dissenting class of creditors; and

      (d)    the rights of the Scheme Creditors, in their capacity as Scheme Creditors,
            will be adjusted pursuant to the Scheme, but the rights of other creditor
            groups will not be impaired.

106.    Accordingly, the standards required to "sufficiently protect" creditors and other

parties in interest have been met, the grant of the Relief Requested would not be manifestly

contrary to the public policy of the United States, and the Relief Requested should be granted.

### iv.    Granting the Relief Requested Meets the Traditional Standards of "Comity" Under Section 1507(b).

107.    While satisfaction of the standards set forth in section 1521 and 1522 are

sufficient to grant the discretionary portions of Relief Requested, to the extent the Court views

section 1507(a) as a necessary predicate to granting such relief, the requested relief meets the

standards of comity set forth in that provision.  *See* 11 U.S.C. § 1507(a) (authorizing "additional

assistance" to a foreign representative).

108.    Section 1507(b) sets forth a list of factors to be considered in determining whether

to grant such "additional assistance." The first is whether the additional assistance will

reasonably assure "just treatment of all holders of claims against or interests in the debtor's

property." Under case law applying former section 304(c), this requirement is satisfied where

the foreign insolvency law provides a comprehensive procedure for the orderly resolution of

claims and the equitable distribution of assets among the estate's creditors in one proceeding.

*See*, *e.g.*, *Bank of New York* v. *Treco* (*In re Treco*), 240 F.3d 148, 158 (2d Cir. 2001); *In re

Culmer*, 25 B.R. 625, 629 (Bankr. S.D.N.Y. 1992). As noted above, the Scheme Claims consist

of beneficial interests in the Notes. The Scheme entitlements are distributed on a *pro rata* basis

(subject to the consensual re-allocations described in paragraphs []), and each Scheme Creditor

has equal rights of participation in the UK Proceeding.

109.    The second enumerated factor, "protection of claim holders in the United States

against prejudice and inconvenience in the processing of claims in such foreign proceeding,"

11 U.S.C. § 1507(b)(2), is satisfied where creditors are given adequate notice of timing and

procedures for filing claims, and such procedures do not create any additional burdens for a

foreign creditor to file a claim. *See*, *e.g.*, *Treco*, 240 F.3d at 158; *In re Hourani*, 180 B.R. 58, 68

(Bankr. S.D.N.Y. 1995). As set forth above, the Debtor has delivered notice of the Scheme and

the Scheme Meeting to the Information Agent for distribution to Account Holders (as defined in

the Scheme) and the Scheme Creditors through the standard Clearing Systems (as defined in the

Scheme) channels. In addition, the Debtor has publicized the proceedings via an announcement

on the Irish Stock Exchange and through websites with links to information respecting the

Scheme and the UK Proceeding. Hard copies of the relevant documents were also made

available (a) for inspection at the offices of Clifford Chance LLP and (b) to Scheme Creditors, at

their written request, at the Debtor's expense.  Non-UK Scheme Creditors and UK Scheme

Creditors are treated equally.

110.    Section 1507(b)(3) requires that the "additional assistance" being considered will

reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor.

There is no basis here to conclude that any of the "additional assistance" requested here will

facilitate such dispositions of the Debtor's property.

111.    Section 1507(b)(4) requires that the "foreign distribution scheme be 'substantially

in accordance' with United States bankruptcy law," but "it does not have to mirror the United

States distribution rules."  *In re Ionica PLC*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999).  Here,

as set forth above in paragraphs 45-48, priority both in right of payment and in distribution of

proceeds of the Debtor's property is respected by the Scheme:  all Noteholders are allocated their

*pro rata* shares of the Scheme entitlements, subject to the agreed-upon reallocations described in

paragraphs 48 above.

112.    Section 1507(b) also requires that any determination of a request for assistance

under chapter 15 be "consistent with principles of comity . . . ."  11 U.S.C. § 1507(b).  Here,

principles of comity support the grant of the relief requested.  Federal courts generally extend

comity "whenever the foreign court had proper jurisdiction and enforcement does not prejudice

the rights of United States citizens or violate domestic public policy."  *See Victrix*, 825 F.2d at

713 (citing *Hilton* v. *Guyot*, 159 U.S. 113, 202-03 (1895)).  As noted above, particularly in the

bankruptcy context, "American courts have long recognized the need to extend comity to foreign

bankruptcy proceedings," because "[t]he equitable and orderly distribution of a debtor's property

requires assembling all claims against the limited assets in a single proceeding; if all creditors

could not be bound, a plan of reorganization would fail."  *Victrix*, 825 F.2d at 713-14.  The

41

doctrine of comity supports the granting of permanent relief enforcing the Scheme under both section 1507 and section 1521 of the Bankruptcy Code in this case, and the Relief Requested should be granted.

### NOTICE

113.     Notice of this Petition has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the Information Agent for distribution to the Scheme Creditors, (iii) the Trustee, (iv) counsel to the Ad Hoc Committee, and (v) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware. It is also being published in the national edition of *The Wall Street Journal*.  Furthermore, notice of the intention to commence this case was given to the Scheme Creditors in the Practice Statement Letter, which was disseminated as described above.  The Petitioner submits that no other or further notice need be provided.

### NO PRIOR REQUEST

No previous request for the relief requested herein has been made to this or any other court.

**WHEREFORE**, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the Relief Requested herein and (ii) granting the Petitioner and Debtor such other and further relief as the Court deems proper and just.

[The remainder of this page is left intentionally blank.]

Dated: November 11, 2015
New York, New York

WACHTELL, LIPTON, ROSEN & KATZ

By: /s/ Emil A. Kleinhaus

Philip Mindlin
Emil A. Kleinhaus
Neil K. Chatani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

Attorneys for David Jiménez Márquez
as Petitioner and Foreign Representative

### VERIFICATION

I, David Jiménez Márquez, hereby declare:

1.      I have been appointed Foreign Representative by the board of directors of Codere

UK and have been declared by the Chancery Division (Companies Court) of the High Court of

Justice of England and Wales as authorized to commence and act in this ancillary case.

2.      I have read this Verification and the foregoing Petition and I am informed and

believe that the factual statements contained therein are true and correct.

3.      I verify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed:   November 11, 2015
            London, England

/s/ David Jiménez Márquez
David Jiménez Márquez